UNITED STATES of America, Appellant,

v.

Ralph SCOPO, Jr., Defendant–Appellee.

No. 168, Docket 93–1201.

United States Court of Appeals, Second Circuit.

Argued Sept. 10, 1993.

Decided March 21, 1994.

Andrew Weissmann, Asst. U.S. Atty., Brooklyn, NY (Mary Jo White, U.S. Atty. for the Eastern District of New York, David C. James, Asst. U.S. Atty., of counsel), for appellant.

Steven R. Kartagener, New York City (Kartagener & Stavis, New York City, James J. DiPietro, Aronne & DiPietro, Brooklyn, NY, of counsel), for defendant-appellee.

Before: NEWMAN, Chief Judge, PIERCE and MINER, Circuit Judges.

PIERCE, Circuit Judge:

On February 11, 1992, defendant-appellee Ralph Scopo, Jr., was indicated for the possession of a firearm with the manufacturer's serial number removed, obliterated or altered and which had been shipped and transported in interstate commerce, in violation of 18 U.S.C. § 922(k) (1988 & Supp. IV 1992), based upon his possession of a fully loaded .38–caliber pistol in the backseat of his car discovered in a January 17, 1992 search of the car incident to a traffic stop. On July 2, 1992, a suppression hearing was held in the United States District Court for the Eastern District of New York (I. Leo Glasser, J.) to determine the admissibility of the firearm seized from Scopo's car, and statements made to the police following his arrest. In an order dated February 19, 1993, the district court granted appellee's motion to suppress the firearm and the statements. The court found that: (1) the stop of Scopo's car, through the pretext of a minor traffic violation, was unjustified because there was no reasonable suspicion that he was engaging in criminal activity; (2) Scopo's arrest was a

pretext to search his car for weapons; and (3) therefore the stop and arrest of Scopo violated the fourth amendment. *United States v. Scopo*, 814 F.Supp. 292 (E.D.N.Y. 1993). The Government appeals from this ruling. For the reasons set forth below, we reverse the order of the district court, and remand for further proceedings consistent with this opinion.

## BACKGROUND

This case involves an investigation into the criminal activities of the Colombo Family of La Cosa Nostra by a joint task force known as the Colombo Family Strike Force ("CFSF"), which was comprised of Federal Bureau of Investigation Agents ("FBI") and New York City Police Detectives. Scopo was indicted for the possession of a firearm with the manufacturer's serial number removed, obliterated or altered and transported in interstate commerce, in violation of 18 U.S.C. § 922(k), on February 11, 1992.[1] On April 22, 1992, Scopo moved to suppress the physical evidence found in his vehicle by the police following a traffic stop and arrest on January 17, 1991, and his ensuing statements made to the police. A suppression hearing was held on July 2, 1992. New York City Police Detectives Matthew Higgins and Benjamin Gozun, CFSF members, testified at the hearing as to the events leading to Scopo's arrest. FBI Agent R. Lindley DeVecchio, also a CFSF member, testified as an expert on the Colombo Family.

The facts produced at Scopo's suppression hearing revealed the following: Since November, 1991, the Colombo Family has been engaged in an internal shooting war which has resulted in several fatalities. The internal war was between those loyal to the jailed head of the Colombo Family, Carmine Persico, and those loyal to Victor Orena, the acting head of the Colombo Family. The two factions divided into "hit teams," which travelled in "caravans" of two to four vehicles to carry out both offensive and defensive activities related to the internal feud. *See United States v. Orena*, 986 F.2d 628, 629 (2d Cir. 1993) (for general discussion of Colombo Family War). One of the major goals of the CFSF was to quell the violence of the shooting war within the Colombo Family by taking "guns out of circulation whenever possible."

On the evening of January 17, 1992, while conducting surveillance of a place where members of the "Orena" faction of the Colombo Family were known to meet—the Mill Basin Social Club, located in Brooklyn, N.Y.—Detectives Higgins and Gozun observed two unoccupied cars parked in front of the club—a dark purple 1992 Cadillac (the "Cadillac") and a 1987 Chevrolet Blazer (the "Blazer"). Shortly thereafter, the police observed a group of men leave the club, including Scopo and his brother, Joseph Scopo, Salvatore Micciotta, and Anthony Mesi. Scopo, Joseph Scopo, and Micciotta were known to the CFSF as members of the Colombo Family.[2] Mesi was not identified as having an affiliation with the Colombo Family. The men entered separate cars, including the Cadillac and the Blazer, and drove to Joseph Scopo's home, located on East 72nd Street in Brooklyn.

Thereafter the Cadillac, occupied by Scopo, and the Blazer, occupied by Mesi, proceeded to Micciotta's home, located on East 73rd Street in Brooklyn, where they "double-parked on the wrong side of the street, facing the wrong direction." The police observed Mesi leave Micciotta's home with what appeared to be a filled rifle carrying case, and re-enter the Blazer. The Cadillac and the Blazer then proceeded along Flatlands Avenue in Brooklyn, followed by four or five unmarked police cars in which there were altogether nine plainclothes detectives.

---

1. 18 U.S.C. § 922(k) provides as follows:

   It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

2. Testimony at the suppression hearing revealed that Scopo, Joseph Scopo, and Micciotta were part of the "Orena" faction in the Colombo Family internal war. Joseph Scopo was an "underboss" in the Colombo Family, and Micciotta, a "capo," or captain.

Twice, the two cars were observed changing lanes without signalling. Since this was in violation of N.Y.Veh. & Traf.Law § 1163(d) (McKinney 1986), the CFSF officers following Scopo and Mesi stopped them for the traffic violations—"boxing" in the Blazer and the Cadillac by positioning their police cars "in front, to the side and the rear" of the cars—as they paused for a red light at an intersection 2.2 miles from the traffic violation. According to Higgins, waiting until the cars had stopped before pulling the drivers over to the side of the road is considered the safest course of action for a nighttime stop. Detectives Higgins and Maggiore approached the driver's side of Scopo's car, and Detective Gozun approached the passenger side. Higgins and Gozun, and possibly Maggiore, had drawn their guns, which was described as a routine practice during a nighttime traffic stop. As Higgins and Gozun approached the Cadillac, they saw Scopo throw an object down inside the car.[3] After Scopo alighted from his car as directed, he was frisked for weapons. Upon pulling forward the passenger seat in the Cadillac to search for the object Scopo was observed throwing down, the police found a fully loaded .38–caliber pistol. According to the police, the butt of the gun had been in "plain view," protruding from a map pouch attached behind the front passenger seat. At that point, Scopo was placed under arrest for the possession of a firearm. Scopo stated upon arrest that "[i]t's not my car, not my gun." The police also uncovered a hunting rifle in Mesi's vehicle.[4] Scopo and Mesi were then transported to the 75th precinct, where each was issued a traffic summons for changing lanes without signalling, and Scopo was read his *Miranda* rights. After being read his rights, Scopo reportedly stated to the police: "F— those A–B–C men, they promised my father ten and they gave him one hundred and fifteen." Scopo was thereafter indicted on February 11, 1992, for possession of an altered firearm with the manufacturer's serial number removed, obliterated or altered, in violation of 18 U.S.C. § 922(k).

The testimony elicited from the witnesses at Scopo's July 2, 1992 suppression hearing revealed that Scopo's arrest was not based upon any information from informants, covert surveillance, wiretapping, or any specific knowledge or information indicating that Scopo was about to engage in criminal activity. In addition, Detective Higgins testified that a typical police duty, in this type of surveillance, was to "issue traffic summonses."

On April 22, 1992, Scopo moved to suppress both the physical evidence and his statements to the police. In a memorandum and order dated February 19, 1993, the district court granted Scopo's motion, suppressing both the firearm and statements he made in the police precinct. The court found in particular that: (1) the stop of Scopo's car, under the pretext of a minor traffic violation, was not justified under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny because there was no reasonable suspicion that Scopo was engaging in a criminal activity, *Scopo,* 814 F.Supp. at 296; and (2) Scopo's arrest was merely a pretext for searching his car for weapons, as evidenced by (a) the testimony of Detective Higgins that the CFSF often utilized the traffic laws to stop suspected Mafia members and confiscate weapons, and (b) the fact that Scopo and Mesi were not stopped until 2.2 miles after the alleged traffic violations. *Id.* at 304–05. The district court's order was entered on February 23, 1993. The Government filed a timely notice of interlocutory appeal on March 18, 1993, pursuant to 18 U.S.C. § 3731 (1988).

## DISCUSSION

The Government, upon appeal, asks this Court to rule on an issue we have hitherto not directly addressed: whether an arrest based upon an observed traffic violation, where the "defendant was also suspected of participating in other criminal activity," violates the fourth amendment because it is based on pretext. The Government argues that the district court erred in granting Scopo's motion because: (1) Scopo's traffic viola-

---

**3.** The object was later identified as a portable telephone.

**4.** Mesi was not prosecuted for possession of the hunting rifle.

tion created probable cause to stop him; and (2) the district court did not apply a wholly objective standard to analyze the actions of the police officers, which is contrary to established fourth amendment precedent. Scopo contends that the district court was correct because there was no reasonable suspicion to stop him, and because the traffic violation was a pretext to conduct a warrantless search of his car and arrest him. Scopo also argues that the district court's order should be affirmed because "the forcible, initial seizure of [Scopo] and his vehicle was tantamount to a full-blown arrest, [and thus] the propriety of the police conduct, for purposes of fourth amendment analysis, must be determined by the application of state law and, therefore, one must conclude that [his] pretextual arrest ... under these circumstances was illegal."

■ "[A]n ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth and Fourteenth Amendments."[5] *United States v. Hassan El,* 5 F.3d 726, 729 (4th Cir.1993) (citing *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)), *petition for cert. filed* (U.S. Dec. 13, 1993) (No. 93–7067). Accordingly, such stops "must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *Id.* (citing *Terry v. Ohio,* 392 U.S.. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Any evidence seized based upon an illegal stop "is subject to the fruit of the poisonous tree doctrine," and may be suppressed. *Id.* (citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

■ Here, Scopo's stop was based upon a specific and articulable fact: the observed traffic violation. Although Scopo's traffic violation, failure to signal while changing lanes as required by N.Y.Veh. & Traf.Law § 1163(d), was minor, the officers acted within their authority in stopping Scopo for violation of the state law. *See* N.Y.Veh. & Traf. Law § 155 (McKinney 1986 & Supp.1994) ("For purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense."); N.Y.Crim. Proc.Law § 140.10(1)(a) (McKinney 1992) (an officer may arrest a person for "[a]ny offense when [the officer] has reasonable cause to believe that such person has committed such offense in [the officer's] presence"); *People v. Cortes,* 86 Misc.2d 155, 382 N.Y.S.2d 445, 447 (Sup.Ct.1976) (a police officer may arrest a person for a traffic violation committed in the officer's presence). Despite the authority to arrest under New York State law, the district court, nevertheless, concluded that the January 17th arrest of Scopo was unlawful because the officers lacked probable cause to believe that Scopo was engaged in criminal activity. *See, e.g., Dunaway v. New York,* 442 U.S. 200, 208, 214, 99 S.Ct. 2248, 2254, 2257, 60 L.Ed.2d 824 (1979) (warrantless arrests are unlawful absent probable cause).

The district court also found that the officers acted unreasonably by blocking Scopo's car and approaching him with guns drawn. The district court relied primarily upon *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) ("persons temporarily detained pursuant to [ordinary traffic stops] are not 'in custody' for the purposes of *Miranda* ") and *United States v. Marin,* 669 F.2d 73, 81 (2d Cir.1982) ("The reasonableness of a particular stop depends in turn on the extent of the intrusion on the rights of the individual, and on the reason for the restraint."), to support this determination. *Scopo,* 814 F.Supp. at 297–98. In sum, then, the district court found that, despite the authority the police had to stop and arrest Scopo under New York State law, they lacked the requisite probable cause to arrest him and search his vehicle because the traffic stop was based upon a pretext. *Id.* at 305. We disagree.

■ Probable cause arises when the police reasonably believe that "an offense has been or is being committed." *United States v. Cruz,* 834 F.2d 47, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1077, 108 S.Ct. 1056, 98 L.Ed.2d 1018 (1988); *see also United States*

---

5. The fourth amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

*v. Fox,* 788 F.2d 905, 907 (2d Cir.1986). In the instant case, there was probable cause to stop and arrest Scopo—CFSF officers directly observed him violating the traffic laws by not signalling lane changes. "When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle." *United States v. Cummins,* 920 F.2d 498, 500 (8th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1992). The fact that the police chose to wait until Scopo stopped at an intersection to arrest him, or that traffic arrests were not necessarily part of their usual duties as a unit created to monitor organized crime activities, does not negate the fact that they directly observed Scopo violating the traffic laws and thus had probable cause to arrest him.

▪ It follows that, once the police had probable cause to stop and arrest Scopo, they were entitled to search both him and his "grab space" in the car, especially since one officer had observed him throw an object down in the car. *See New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981) ("when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile") (footnotes omitted); *United States v. Paulino,* 850 F.2d 93, 98 (2d Cir.1988) (the defendant's "furtive movement provided a legal basis for the protective search"), *cert. denied,* 490 U.S. 1052, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989).

▪ In general, law enforcement officials, pursuant to the fourth amendment, must obtain a search warrant in order to seize an individual's property. *United States v. Jenkins,* 876 F.2d 1085, 1088 (2d Cir.1989) (per curiam) (citation omitted). The warrant requirement "creates a presumption that any warrantless search or seizure is unconstitutional, and requires that evidence obtained in such illegal searches be excluded from trial." *Id.* (citation omitted). Detective Gozun testified that (i) Scopo threw an object down in the car, and (ii) the butt of the confiscated firearm had been in "plain view." The "plain view" exception to the fourth amendment

warrant requirement "authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983). Under this exception to the fourth amendment warrant requirement, a police officer may seize evidence when in "plain view" if: "(1) the officer's initial intrusion was permissible under the fourth amendment; (2) the discovery of the evidence is 'inadvertent'; and (3) the incriminating nature of the evidence found is 'immediately apparent'." *Jenkins,* 876 F.2d at 1088. Here, the police had "authority" to stop and arrest Scopo pursuant to New York State law; the police saw Scopo throw down an object; and the mere presence of a partially concealed firearm is highly and immediately incriminating. Thus, we find that the district court's ruling was incorrect, and we conclude that the police were justified in both stopping and arresting Scopo, and in seizing his firearm.

The district court concluded that Scopo's traffic violation was merely a pretext to search his car for weapons. *Scopo,* 814 F.Supp. at 305. In reaching its conclusion, the district court applied the "usual police practices" approach, adopted by the Tenth and Eleventh Circuits, which asks "'not whether the officer *could* validly have made the stop, but whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose.'" *United States v. Rivera,* 867 F.2d 1261, 1263 (10th Cir.1989) (quoting *United States v. Guzman,* 864 F.2d 1512, 1515 (10th Cir.1988)).

▪ We believe that the "usual police practices" approach is not a wholly objective test, because it requires a reviewing court to look into the motivations and hopes of an arresting officer. The Supreme Court has consistently held that an objective test should be applied to issues surrounding the constitutionality of searches and seizures under the fourth amendment. *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1880–1881; *United States v. Mendenhall,* 446 U.S. 544, 551, 554

n. 6, 100 S.Ct. 1870, 1875, 1877 n. 6, 64 L.Ed.2d 497 (1980); *United States v. Robinson,* 414 U.S. 218, 236, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973). The case of *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), is highly instructive. In that case, a police officer executed a search warrant, hoping to discover items which were not included in the warrant. *Id.* at 131, 110 S.Ct. at 2305. The Supreme Court stated that the fourth amendment "plain view" doctrine did not require that the items be found inadvertently, as long as "the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement." *Id.* at 138, 110 S.Ct. at 2309.

■ The Supreme Court has, in fact, stressed that analysis of fourth amendment issues involves " 'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time' and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985) (quoting *Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978)). In our view, the fact that an officer may be engaged in an arrest which would not usually be effected in the course of the officer's normal duties does not negate the validity of the arrest. In *United States v. Villamonte–Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), a vessel was boarded by customs agents for the purpose of checking its documents. *Id.* at 583, 103 S.Ct. at 2577. The agents were accompanied by a state law enforcement officer who had received a "tip" regarding narcotics smuggling activities. *Id.* at 584 n. 3, 103 S.Ct. at 2577 n. 3. When the agents and officers boarded the vessel, the smell of marijuana was evident, and a search of the vessel revealed several tons of marijuana. *Id.* at 583, 103 S.Ct. at 2577. The Supreme Court ruled in that case that the seizure was constitutional because the customs agents were authorized to check the vessel's documents. *Id.* at 593, 103 S.Ct. at 2577. Thus, applying *Macon* and *Villamonte–Marquez,* the fact that the CFSF members did not usually effect traffic arrests, or that they "hoped" to discover firearms in Scopo's car, should not be

the determinative factors. "It is sufficient that the officer had probable cause to arrest [the appellee] and that [the officer] lawfully effectuated the arrest...." *Gustafson v. Florida,* 414 U.S. 260, 265, 94 S.Ct. 488, 492, 38 L.Ed.2d 456 (1973).

The Government urges this Court to adopt a more wholly objective "authorization" test, stating that this approach is more in keeping with current Supreme Court fourth amendment authority. Under this test, "so long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional." *United States v. Trigg,* 878 F.2d 1037, 1041 (7th Cir.1989), *aff'd on appeal after remand,* 925 F.2d 1064, 1065 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991). This approach has been adopted or noted with approval by several circuits. *See, e.g., United States v. Mitchell,* 951 F.2d 1291, 1295 (D.C.Cir.1991) ("It is well settled that a court must look to objective circumstances in determining the legitimacy of police conduct under the Fourth Amendment, rather than an officer's state of mind."), *cert. denied,* —— U.S. ——, 112 S.Ct. 1976, 118 L.Ed.2d 576 (1992); *United States v. Hawkins,* 811 F.2d 210, 215 (3d Cir.) (The existence of a pretext for a *Terry* stop "does not render invalid an otherwise constitutional search."), *cert. denied,* 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987) (footnote omitted); *United States v. Causey,* 834 F.2d 1179, 1184 (5th Cir.1987) (in banc) ("so long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry") (footnote omitted); *Cummins,* 920 F.2d at 501 ("stop remains valid even if the officer would have ignored the traffic violation but for his other suspicions").

■ The "authorization" approach has also been adopted by the Fourth and Sixth Circuits. In *United States v. Hassan El,* the defendant was stopped for failing to stop at an intersection, and then arrested for possession of a firearm, by members of the "Operation Flex Unit"—a unit created to investigate primarily narcotics and firearm offenses. 5 F.3d at 728. The Fourth Circuit held that

"when an officer observes a traffic offense or other unlawful conduct, he or she is justified in stopping the vehicle under the Fourth Amendment." *Id.* at 730. In so holding, the court noted that "[s]uch a limited detention does not become 'unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity.'" *Id.* (quoting *Cummins*, 920 F.2d at 501). In *United States v. Ferguson*, 8 F.3d 385 (6th Cir.1993) (in banc), the police followed the defendant because he was acting in a suspicious manner. *Id.* at 386–87. The defendant's car was stopped because it had no visible license plate—a violation of a Memphis traffic ordinance—and then he was arrested because a firearm was in "plain view" in his car. *Id.* at 387. In adopting the "authorization" test, the Sixth Circuit, sitting in banc, rejected a line of cases that had employed the "usual police practices" test. *Id.* at 389–91. In explaining its new test, the court wrote:

> We focus not on whether a reasonable officer "would" have stopped the suspect ..., or whether any officer "could" have stopped the suspect ..., but on whether this particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop. The stop is reasonable if there was probable cause, and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop. It is also irrelevant whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop.

*Id.* at 391. We believe that the "authorization" test of the circuits cited herein "will better achieve the objective assessment of the officer's actions required by the Supreme Court." *Id.* We, too, hold that where the arresting officer had probable cause to believe that a traffic violation occurred or was occurring in the officer's presence, and was authorized by state or municipal law to effect a custodial arrest for the particular offense, the resulting arrest will not violate the fourth amendment.

We believe that adopting the "authorization" approach will, as noted by the majority opinion of the Sixth Circuit in *Ferguson*, best ensure that the validity of traffic stops and arrests "is not subject to the vagaries of police departments' policies and procedures," while at the same time preventing insulation of persons involved in criminal activities from "criminal liability for those activities simply because a judge determines that the police officer who executed the traffic stop ... would not have stopped them for the traffic offense that they in fact committed." *Id.* at 392. This approach also allows law enforcement officials the freedom to enforce violations of the law—even minor ones—when they actually view violations, and, finally, it ensures "that the courts leave to the legislatures the job of determining what traffic laws police officers are authorized to enforce and when they are authorized to enforce them." *Id.*

The "authorization" approach is also in keeping with this Court's pretextual arrest doctrine. For example, in *United States v. Nersesian*, 824 F.2d 1294 (2d Cir.), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987), we rejected a subjective test, stating that as long as "a valid basis for a detention and search ... exists ... [it] is not rendered invalid by the fact that police resort to a pretext for one purpose or another to continue that detention and search." *Id.* at 1316; *see also United States v. MacDonald*, 916 F.2d 766, 771–72 (2d Cir.1990) (in banc) (pretext of police not important where actions of police were legal and authorized), *cert. denied*, 498 U.S. 1119, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991); *United States v. Smith*, 643 F.2d 942, 944 (2d Cir.) ("the proper standard for judging the constitutionality of a search is a totally objective one"), *cert. denied*, 454 U.S. 875, 102 S.Ct. 350, 70 L.Ed.2d 182 (1981).

The district court relied on our opinion in *United States v. Caming*, 968 F.2d 232, 235 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 416, 121 L.Ed.2d 339 (1992), to declare that the "usual police practices" approach is not inconsistent with this Court's approach to fourth amendment pretextual arrests. In *Caming*, we simply agreed with the district

court's determination that the defendant "ha[d] not shown that his arrest was a pretext to enable [police] to search his car." *Id.* at 236. We never reached the question of whether the arrest would have been unconstitutional if the defendant had demonstrated that his arrest was pretextual. *Caming* does not provide a basis for concluding that the "usual police practices" approach has been adopted in this Circuit.

Scopo claims that the "authorization" approach will fail to prevent arbitrary police actions because it "insulates, and even encourages, police arbitrariness." We disagree with this contention, for, whether applying either the "authorization" test or the "usual police practices" test to fourth amendment search and seizure issues, a reviewing court must always "consider the reasonableness of the officers' conduct in light of the circumstances following the initial stop." *Hassan El,* 5 F.3d at 731. Here, the CFSF officers were empowered under New York State law to effect a stop and arrest for a traffic violation. After Scopo and Mesi were stopped, the police observed Scopo drop an object. Once Scopo was removed from his car, the police conducted a protective search incident to an arrest, and discovered a firearm in "plain view." From these facts, we conclude that the police had probable cause to act, and to search Scopo's car, and that the district court erred in suppressing the evidence of the gun and Scopo's statements.

■ Finally, Scopo argues that police actions should be evaluated under New York State law, rather than federal law, where, as here, the propriety of a search is wholly dependent upon the lawfulness of an arrest. *See Ker v. California,* 374 U.S. 23, 37, 83 S.Ct. 1623, 1632, 10 L.Ed.2d 726 (1963) ("The lawfulness of arrests for federal offenses is to be determined by reference to state law insofar as it is not violative of the Federal Constitution."); *United States v. Di Re,* 332 U.S. 581, 589, 68 S.Ct. 222, 226, 92 L.Ed. 210 (1948) ("[I]n absence of an applicable federal statute the law of the state where an arrest without warrant takes place determines its validity."). However, appellee's argument was correctly rejected by the district court. *Scopo,* 814 F.Supp. at 295–96 n. 6. Under New York State law, it is clear that a traffic offense can be a basis for an arrest. *See Cortes,* 382 N.Y.S.2d at 447; *People v. Nelson,* 127 Misc.2d 583, 486 N.Y.S.2d 979, 984 (Sup.Ct.1985) (a "vehicle's operator [is] subject to arrest" for traffic infractions). Whether a search and seizure is constitutional under the circumstances of a particular case, however, is determined by applying federal law. *See United States v. Pforzheimer,* 826 F.2d 200, 204 (2d Cir.1987) (even when a state crime was investigated solely by state officers, a federal court must apply federal law to evaluate search and seizure issues).

## CONCLUSION

We have considered all of Scopo's contentions, and find them to be without merit. For the foregoing reasons, we reverse the order of the district court, and remand for further proceedings consistent with this opinion.

JON O. NEWMAN, Chief Judge, concurring:

The Court today rules that a police officer may make an arrest for a traffic violation as long as the officer has objectively reasonable probable cause to believe the violation has occurred, even though the officer may have decided to make the arrest because of a desire to search the vehicle of a suspected criminal. I concur in Judge Pierce's careful opinion for the Court, upholding this result because I agree that it is required by current Fourth Amendment jurisprudence, but I write separately to point out both the risk that such an approach entails and the limits of the doctrine.

What is at issue is a so-called "pretext" arrest: an officer has probable cause to make an arrest because the officer has observed a violation, albeit a minor one for which the officer probably would not have made an arrest had there not existed some motivation beyond the observed offense. In this case, the motivation is that the suspect is believed to be associated with an organized crime family, and an arrest, which will normally justify a search, might yield evidence of a more serious crime, as occurred in this case when the arresting officer found a gun in Scopo's car. The risk inherent in such a

practice is that some police officers will use the pretext of traffic violations or other minor infractions to harass members of groups identified by factors that are totally impermissible as a basis for law enforcement activity—factors such as race or ethnic origin, or simply appearances that some police officers do not like, such as young men with long hair, heavy jewelry, and flashy clothing.

In upholding Scopo's arrest, we should not be understood to be giving police officers carte blanche to skew their law enforcement activity against any group that displeases them. Though the Fourth Amendment permits a pretext arrest, if otherwise supported by probable cause, the Equal Protection Clause still imposes restraint on impermissibly class-based discriminations. "[I]f [the law] is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution." *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886).[1]

The appellee makes a strong point in warning that permitting pretext arrests runs the risk that some discrimination may occur and may escape detection. I agree that such a risk is not fanciful, but I am satisfied that the Fourth Amendment does not prohibit a pretext arrest and that the Equal Protection Clause has sufficient vitality to curb most of the abuses that the appellee apprehends. Police officers who misuse the authority we approve today may expect to be defendants in civil suits seeking substantial damages for discriminatory enforcement of the law.

---

1. *See United States v. Rusher,* 966 F.2d 868, 889 (4th Cir.1992) (Luttig, J., concurring in part and dissenting in part) ("[T]he due process clause ... and, where appropriate, the equal protection clause ... constitute adequate protection and remedy against such abuses of the public's trust." (citations omitted)), *cert. denied,* —— U.S. ——, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992); *Shaw v. California Department of Alcoholic Beverage Control,* 788 F.2d 600, 610–11 (9th Cir.

1986) (former tavern owners can maintain action against police department and other municipal defendants for racially discriminatory enforcement of the law in violation of equal protection); *see also Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985) (allowing defense of selective prosecution where defendant can demonstrate discriminatory effect and improperly-motivated prosecution).