THE UNITED STATES of America,

v.

Christopher HIRUKO and Daniel Gonzalez, Jr., Defendants.

No. 03 CR 1124(JG).

United States District Court, E.D. New York.

June 9, 2004.

Michael Weil, The Legal Aid Society, Federal Defender Division, Brooklyn, NY, for Christopher Hiruko.

Nancy Lee Ennis, Quijano & Ennis, P.C., New York, NY, for Daniel Gonzalez.

Roslynn R. Mauskopf, United States Attorney, Eastern District of New York, Brooklyn, NY, By Robert Henoch, Assistant U.S. Attorney.

*MEMORANDUM AND ORDER*

GLEESON, District Judge.

Defendants Christopher Hiruko and Daniel Gonzalez, Jr. are charged with conspiracy and substantive counterfeiting offenses. Hiruko moves to suppress counterfeit money allegedly seized from the

floor in the back seat of the car that he was driving on September 11, 2003, the day the defendants were arrested. Gonzalez seeks to suppress that evidence and the counterfeit money that was seized from his person that day. Both defendants seek suppression of their post-arrest statements.

The government opposes these motions on the ground that the evidence was obtained as the result of a lawful investigative detention. Specifically, the government asserts two theories, which both rely on the asserted fact that there were two bills on the floor in the rear of Hiruko's car. First, the government contends that the counterfeit nature of those bills was apparent on plain view. Second, it argues that, given the "drug prone location" in which the car was stopped, the bills were properly seized as contraband even if their counterfeit nature was not apparent; then, upon closer inspection, it was clear they were counterfeit. (Tr.[1] at 89) (explaining government's "two alternative theories.") Because I find that the government has failed to prove the two bills were even present on the floor in the rear of the car, I grant both of the defendants' motions.

## FACTS

On September 11, 2003, at 3:00 in the afternoon, Detective John Soto was on a narcotics enforcement patrol in Astoria, Queens, near 49th Street and Ditmars Avenue. He drove an unmarked car accompanied by two brother officers, all of whom were in plain clothes. Soto testified that he observed a gray Nissan, with four occupants, travel at a high rate of speed through that intersection. Soto pulled the police vehicle behind the Nissan. Although an instant earlier the Nissan was allegedly speeding, it was now stuck in heavy traffic. At that time, Soto could see

that none of the vehicle's occupants was wearing a seat belt.

Soto got out of the police car and approached the Nissan's driver, the defendant Christopher Hiruko. About thirty seconds into his interview of Hiruko, Soto's attention was diverted to the two men in the back seat. As Soto put it: "I started to notice the two rear passengers. For me they were acting a little too nervous for a vehicle traffic stop. They were looking at each other, looking at me, looking at each other and looking at me and that immediately raised my suspicions." (Tr. at 15.)

Soto discontinued his interview of Hiruko and focused on the two men sitting in the back seat, Edwin Rivera (age 17 years) and the other defendant Daniel Gonzalez (age 20 years). Gonzalez was seated behind Hiruko, closer to Soto. Soto claims to have noticed "a large lump" in Gonzalez's right front pants pocket. (Tr. at 16.) He testified that the lump "[c]ould have been narcotics, could have been a small 22 [caliber handgun], it could have been a large wad of money." (Tr. at 37.) Soto further asserted that he saw Gonzalez "fidgeting right around where the bulk was in his pants." (Tr. at 17.) Soto testified that he had a concern for his safety at that point (Tr. at 39), and thus he ordered everyone out of the car.

Gonzalez exited from the rear driver's side door of the four-door vehicle, and Rivera exited the other rear door. Hiruko exited the driver's seat; 16 year-old Frances Cardona (who was seated in the front seat on the passenger side) exited the front passenger door. Gonzalez was not patted down as he got out; rather, Soto directed him toward the rear of the car, where another officer was positioned. Soto testified that when everyone was out of the

---

1. "Tr." refers to the transcript of the January 7, 2004 suppression hearing.

car, he viewed two counterfeit $100 bills on the floor in the rear of the car, where Gonzalez had been sitting. Soto stated that all four occupants were then placed under arrest.

A total of 119 additional counterfeit bills were seized as a result of the arrests. Either 59 or 61 bills were seized from Gonzalez's right front pants pocket and either 60 or 58 bills were seized either from the front passenger side of the car, where Cardona had been sitting, or in Cardona's purse, or perhaps some combination of the two.[2] The reason for the confusion over the precise number of bills seized from each source is that although counterfeit was allegedly seized from three locations (Gonzalez's pocket, the front passenger area or Cardona's person, and the back seat floor), only two separate seizures were vouchered. Soto admitted that the two bills seized from the rear seat floor had been had been mixed with GX 1–B, the bills seized from Gonzalez's pocket. (Tr. at 22–25.) On cross-examination, however, Soto could not say whether the two bills that he said he seized from the

floor in the rear of the car were vouchered with Gonzalez's bills or into GX 1–A, the bills seized from the front of the car. (*See* Tr. at 55–56.)

Just as the handcuffs were coming out— "as soon as [Hiruko] knew he was getting arrested" (Tr. at 31)—Hiruko said he had been arrested on counterfeiting charges in the past, and was on probation. He said he had taught the others in the car how to make counterfeit "as a joke," but he denied participating in making the counterfeit currency seized from the car and from Gonzalez. (Tr. at 32.) Cardona said it was not Hiruko's counterfeit money. She also said they were on the way to the mall to spend the money.

Because counterfeiting is a federal offense that falls within the investigative jurisdiction of the United States Secret Service, the case was turned over to the Secret Service. On October 7, 2003, Hiruko and Gonzalez were indicted on charges of conspiracy to make and pass counterfeit currency (Count One), making counterfeit currency (Count Two), and attempting to pass counterfeit currency (Count Three).

---

2. There is some confusion as to precisely where this counterfeit money was located. Soto testified both that the money was seized from Cardona's seat (Tr. at 43, 56) and from the floor in front of the seat, (Tr. at 24, 30, 43, 56). Apparently there was money seized from Cardona's purse (*id.* at 56), either in addition to or instead of the money seized near her. Hiruko submitted an affidavit in which he stated that he "only saw currency being recovered from other people in the car when they were searched." (Weil's Jan. 5, 2004 Ltr., Decl. ¶ 3.) The complaint states that $6,000 was recovered from Juvenile # 1 (Cardona). (Compl. ¶ 2.) Agent William McCool testified that Soto told him that the currency was retrieved from the back of the vehicle and from Cardona's purse. (Tr. at 74.) At the suppression hearing, Gonzalez's attorney argued that all of the money recovered was either from Cardona's purse or Gonzalez's person.

If the bills in the front seat (as well as their counterfeit nature) was in plain view, then there likely would have been probable cause to arrest the defendants. *See Maryland v. Pringle,* —— U.S. ——, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003). However, perhaps because of these vagaries in the evidence, the government does not rely on the seizure of these front-seat bills to sustain its burden on these motions. Indeed, in its December 24, 2003 letter in opposition to the suppression motions, the government does not even mention the counterfeit bills that were seized either from or near Cardona. And, as stated above, the government explicitly relied at the hearing solely on the alleged seizure of the two bills from the floor in the rear of the car. (Tr. at 89.) Even if the government had relied on the front-seat bills, it would have been to no avail because the testimony as to the location of those particular bills was inconclusive. I also note that the government has not made any inevitable discovery argument.

Neither Cardona nor Rivera were prosecuted, apparently because they are juveniles.

As stated above, the linchpin of these motions is Soto's claim that he observed two bills on the floor of the car behind the driver's seat. I do not credit the testimony that this occurred. Specifically, the government has not proved by a preponderance of the evidence that there were any bills at all in that location. Soto's testimony on this and other issues contained inconsistencies and anomalies that cause me not to credit the testimony.

For example, Soto apparently told the Secret Service that he saw the bills on the floor of the car "[a]s the officers approached the vehicle." (Compl.¶ 2.) That, I find, would have been nearly impossible, given the small size of the car and the large size of its rear-seat passengers.[3] At the hearing, Soto first testified that he saw the bills after Gonzalez exited the car. (Tr. at 18–19.) Then he said he saw the bills "after I was interviewing the driver and referred my attention to the rear passengers." (Tr. at 50.) At that point, Gonzalez was still in the car. (See Tr. at 15–16.) But immediately after that, Soto again testified that Gonzalez and Rivera were already out of the car when the two bills were found. (Tr. at 51.) Soto apparently told the Secret Service that he noticed the bills were counterfeit because the ink was smeared. (Compl.¶ 2.) That too, I find, would not have been possible, given the clear appearance of the bills and Soto's vantage point. At the hearing, Soto testified that he noticed the bills were counterfeit not because the ink was smeared, but because "the color of the bills was off." (Tr. at 19). Soto also apparently told the Secret Service that the front-seat counterfeit was seized from Cardona's purse (Tr. at 74), whereas he testified that it was seized from the car itself.

I might dismiss the foregoing inconsistencies as the byproduct of poor communication if it were not for other troubling features of Soto's testimony. Soto testified that he observed a bulge in Gonzalez's pants when Gonzalez was sitting in the back of the car. I do not credit this testimony. The bills from Gonzalez's pocket were received into evidence at the hearing. When the bills are folded in half and pressed together, they measure barely half an inch in thickness. Soto's testimony that he saw a bulge in Gonzalez's right front pants pocket while he was seated in the back of the car strains credulity.

Second, Soto's actions were consistent with the notion that the bulge is a recent fabrication. If Soto had actually observed a bulge that he thought might be a gun, as he testified, common sense would suggest that he would have patted down Gonzalez the moment Gonzalez exited the vehicle. But he did not. Instead, Soto, who did not have his gun drawn (Tr. at 60), simply directed Gonzalez toward the rear of the vehicle, where another officer was waiting. He then turned his back to Gonzalez, the suspect he allegedly feared, while tending to other matters. In short, Soto acted like he had not seen the bulge he now claims to have seen.

It is also troubling that the two bills Soto claims to have found separately were commingled with the other bills that were seized. Fungible evidence seized from different locations is typically vouchered separately. Particularly where contraband is seized from a vehicle including several occupants, the precise location or locations

---

**3.** Gonzalez and Rivera are both well over 200 pounds. I have not seen Rivera, but Gonzalez is obese. As for the car, the testimony identified it only as a Nissan, but the government's letter-brief in opposition to the motion specifies that it was a Sentra.

from which it was seized can be critical in determining who, if anyone, should be charged with its possession. As a general rule, therefore, care is taken in vouchering such evidence in a manner that helps to preserve the distinctive character of its locations in the vehicle. Indeed, in this very case, the front-seat counterfeit was vouchered separately from the counterfeit seized from Gonzalez, reflecting the importance of location. Yet, according to Soto, two bills seized from the back seat were simply tossed into one of the other evidence bags with counterfeit seized elsewhere. I conclude otherwise. The failure to voucher the two bills allegedly seized from the floor in the rear unfortunately bolsters the conclusion that Soto's testimony about those bills was fabricated to justify the arrests.

In light of all these defects in the testimony, I find that the government has failed to prove by a preponderance of the evidence that two bills were found on the floor in the back seat of Hiruko's car.[4]

## DISCUSSION

### A. The Initial Stop and Seizure of Hiruko and Gonzalez

■ Not every interaction between the police and an individual is a seizure within the meaning of the Fourth Amendment. *United States v. Lee*, 916 F.2d 814, 819 (2d Cir.1990). Only if the police in some way detain or restrain the individual's liberty by means of physical force or show of authority is there a seizure that triggers the protections of the Fourth Amendment. *Florida v. Bostick*, 501 U.S. 429, 434, 111

S.Ct. 2382, 115 L.Ed.2d 389 (1991); *Terry v. Ohio*, 392 U.S. 1, 20 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A seizure occurs where a reasonable person would not feel "free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 439, 111 S.Ct. 2382; *see also Lee*, 916 F.2d at 819 ("[A]n individual can be said to have been seized by the police only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.") (quotation marks and citations omitted).

Although Hiruko's car was stuck in traffic, stationary, when Soto approached it, the parties have assumed, as will I, that his approach to the car was the sort of traffic stop that constitutes a limited seizure within the meaning of the Fourth Amendment. *See Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Harrell*, 268 F.3d 141, 148 (2d Cir.2001); *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.1994). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Scopo*, 19 F.3d at 781–82 (In order to stop a car, the police must have either "probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct" and "[w]hen an officer observes a traffic offense-however minor-he has probable cause to stop the driver of the vehicle.") (quotation marks and citations omitted). Here, the initial stop of the vehicle was

4. *See United States v. Matlock*, 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."); *United States v. Robinson*, No. CR 301–276(CFD), 2002 WL 1359689, at

*1 (D. Conn. Jun.18, 2002) (government's burden of proof at suppression hearing is preponderance of the evidence); *United States v. Rucker*, 32 F.Supp.2d 545, 551 (E.D.N.Y. 1999) (same); *United States v. Bayless*, 921 F.Supp. 211, 213 (S.D.N.Y.1996) (same).

justified by an observed violation of New York's seatbelt law. *See* N.Y. Veh. & Traffic Law § 1229–c(3) ("No person shall operate a motor vehicle unless such person is restrained by a safety belt approved by the commissioner. No person sixteen years of age or over shall be a passenger in the front seat of a motor vehicle unless such person is restrained by a safety belt approved by the commissioner.").

It is also well-settled that police may order the occupants out of a car during a routine traffic stop. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (where police officers on routine patrol observed defendant driving an automobile with an expired license plate and lawfully stopped vehicle for purpose of issuing a traffic summons, order that defendant get out of automobile was reasonable and thus permissible under Fourth Amendment); *Maryland v. Wilson*, 519 U.S. 408, 410, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (extending *Mimms* to passengers); *Mollica v. Volker*, 229 F.3d 366, 369 (2d Cir.2000) ("We focus first on the constitutionality of the initial stop because if a stop is lawful, passengers and drivers have no Fourth Amendment interest in not being ordered out of the stopped vehicle.")

Thus, there was no Fourth Amendment violation in Soto's ordering the defendants out of the car. It does not matter what Soto's subjective motivation was, although certainly it was not to enforce seatbelt safety requirements. Because he was empowered to stop the vehicle and to direct its occupants out of the car based on the seatbelt law violation, his hidden agenda to investigate for narcotics violations is immaterial. *See United States v. Dhinsa*, 171 F.3d 721, 724–25 (2d Cir.1998) ("An officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no

constitutional significance."); *Whren*, 517 U.S. at 814, 116 S.Ct. 1769 ("[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent.").

However, a garden-variety traffic violation is a limited seizure under the Fourth Amendment, *Scopo*, 19 F.3d at 781, as "the purpose of the stop is limited and the resulting detention quite brief," *Prouse*, 440 U.S. at 653, 99 S.Ct. 1391; *see also Berkemer v. McCarty*, 468 U.S. 420, 437, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (the detention of a motorist during a routine traffic stop is "presumptively temporary and brief" and the motorist in such a situation expects that, after receiving a citation from the officer, he may be allowed to continue on his way.) During a traffic stop, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* at 439, 104 S.Ct. 3138.

## B. *The Search of Gonzalez*

■ The government contends first that the subsequent conversion of the lawful investigative and limited detention into a full-blown arrest of the defendants was lawful because two counterfeit bills were observed in plain view on the floor of the car behind the driver's seat. (Gov't Dec. 24, 2003 Ltr. ("Gov't Ltr.") at 6; Tr. at 89.) On factual grounds, for the reasons set forth above, I reject that argument. The government has not proved that two counterfeit $100 bills were there, and I believe they were not.

The government's back-up argument is that even if the counterfeit nature of the two bills was not readily apparent, it was reasonable for Soto to believe that the money was contraband, thus giving him

cause to search Gonzalez, because (a) Gonzalez was acting suspiciously; and (b) it was drug-prone area. (Gov't Ltr. at 6, Tr. at 89.) Again, because I find that the two bills were not on the floor, this argument fails as well. But I also note that even if I believed there were two $100 bills on the car floor, there still would have been no reason to search Gonzalez. The claim that this was a "drug-prone" area is not supported by the facts. In the six weeks preceding the events in this case, "[a]pproximately one or two" arrests for "marijuana" had been made on 49th Street, presumably near Ditmars Avenue. (Tr. at 10.) That simply does not qualify the area for treatment as "drug-infested" at any time, let alone during a traffic jam at 3:00 in the afternoon. The government does not explain why these facts support its "drug-prone" characterization. Commonsense, as well as the case law, suggests otherwise. *See, e.g., United States v. Alexander*, 907 F.2d 269, 270–71 (2d Cir. 1990) (characterizing area as one of high drug trafficking where on previous occasions an officer had witnessed numerous drug transactions and had made several arrests). Even if this were a high crime area, an individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. *See Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *cf. Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("[I]t was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police .... [Such] [n]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion.")

As for Gonzalez's "furtive gestures" (Gov't Ltr. at 6), the evidence is again deficient. That two youthful occupants in the rear of a car would look at each other and at a police officer during a traffic stop, and even look nervous, does not give rise to an objectively reasonable heightened suspicion. *See United States v. Parker*, No. 99–CR–123 (JG), 1999 WL 997282, at *6 (E.D.N.Y. Oct.18, 1999) (no investigative stop warranted based on reasonable suspicion where police officer observed defendant in car turn his view away from the officer and then looked back at the officer three times); *see also United States v. Crump*, 62 F.Supp.2d 560, 565 (D.Conn. 1999) ("The fact that the defendant was acting 'a little nervous' has limited significance since most citizens, whether innocent or guilty, are likely to exhibit some signs of nervousness when confronted by the police.") There were no other furtive gestures. I do not credit the testimony that Soto saw a bulge in Gonzalez's pocket, or that Gonzalez was "fidgeting around right where the bulk was in his pants." (Tr. at 17.) [5]

---

5. Though I do not credit Soto's testimony that he observed a bulge in Gonzalez's pants that indicated a weapon, I would suppress the counterfeit money retrieved from his pocket in any event. It is true that where a lawful investigatory detention is in progress, an officer may conduct a protective frisk for weapons, so long as he or she reasonably suspects that a detainee is armed. *Terry*, 392 U.S. at 27, 88 S.Ct. 1868; *United States v. Colon*, 250 F.3d 130, 134 (2d Cir.2001). And an unusual bulge in an individual's pocket, *see United States v. Hamilton*, 978 F.2d 783, 785 (2d Cir.1992); *United States v. Garcia*, 279 F.Supp.2d 294, 300 (S.D.N.Y.2003), or furtive movements by an individual, *see United States v. Paulino*, 850 F.2d 93, 98 (1988), could justify a frisk. However, the frisk is effected by a pat down of the detainee's clothing. *See, e.g., United States v. Rogers*, 129 F.3d 76, 79 (2d Cir.1997). If the officer feels something that is clearly not a weapon, continued exploration will result in suppression of any contraband recovered through the pat down. *Minnesota v. Dickerson*, 508 U.S. 366, 378–79,

Thus, even if two $100 bills had been found on the floor of the car, there would have been no lawful basis to deem them contraband based on the officer's vantage point and the circumstances. *See, e.g., United States v. Paulino,* 850 F.2d 93, 98 (2d Cir.1988) (although officer had basis to lift up car floor mat to search for weapon, once no weapon was found, officer had no basis to physically examine packet of money found thereunder, because, *i.e.,* it was not patently counterfeit).

In sum, on the facts before me, I conclude that Gonzalez was lawfully ordered out of the car but then unlawfully searched. Without justification under the Fourth Amendment, counterfeit currency was seized from his pants pocket. As the product of an unlawful search of Gonzalez, his motion to suppress that evidence is granted. *See Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Crews,* 445 U.S. 463, 470, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980).

### C. The Arrest of Hiruko

■ "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *United States v. Fisher,* 702 F.2d 372, 375 (2d Cir.1983). Proximity to criminal conduct is generally insufficient to establish probable cause; rather, a search or seizure of a person "must be supported by probable cause particularized with respect to that

person." *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *see also United States v. Moreno,* 897 F.2d 26, 31 (2d Cir.1990) ("[M]ore than physical companionship and/or a working relationship is required to establish probable cause with respect to a companion of a suspect.") (quotation marks and citation omitted), *abrogated on other grounds by Ruggiero v. Krzeminski,* 928 F.2d 558, 561 (2d Cir.1991).

By the same token, proximity to criminal conduct under certain circumstances may change the calculus. In *Maryland v. Pringle,* —— U.S. ——, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), the Supreme Court held that there was probable cause to arrest a front seat car passenger under the following circumstances: there was $763 of rolled-up cash found in the glove compartment directly in front of the defendant; there were five plastic glassine baggies of drugs found behind the back-seat armrest (which was accessible to all three of the car's occupants); and all three car occupants failed to provide any information as to who owned the drugs or the money. *Id.* at 800. The Court distinguished the guilty-by-association cases, such as *Ybarra,* on the basis that the defendant and his two cohorts were in a relatively small car, as opposed to a public place, and because a car passenger will often be involved in a common enterprise with the driver. *Pringle,* —— U.S. at ——, 124 S.Ct. at 801; *see also United States v. Patrick,* 899 F.2d 169, 171–72 (2d Cir.1990) (probable cause existed for immigration officials to arrest traveling companion of person found with cocaine in bag because they both told the

---

113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). If it is apparent to the officer that the object being felt is narcotics, the pat down provides "probable cause to search the suspect for drugs." *United States v. Salazar,* 945 F.2d 47, 51 (2d Cir.1991); *see also Rogers,* 129 F.3d at 79–80.

Here, the officer's pat-down of Gonzalez would not have indicated drugs or a gun. Thus, it would have been unconstitutional for the officer to have taken the money out of Gonzalez's pocket even if the officer had seen a bulge.

unusual and suspicious story of accidentally crossing the border into Canada on a bus and walking back to the United States, which "provided an adequate basis for the officials to reasonably believe that [the defendant] was not just a mere innocent traveling companion but was traveling *and* acting in concert with [his companion] in transporting the cocaine.").

Although Hiruko lacks standing to challenge the unlawful search of Gonzalez, the recovery of contraband from Gonzalez's pants pocket, standing alone, did not constitute probable cause to arrest Hiruko. At the time of the seizure, there was no factual basis to impute to Hiruko the counterfeit seized from Gonzalez's person. It was not easily accessible to the other car passengers. There was no reason why Hiruko would have known about it, and there were no strange stories or any other clues that might have connected Hiruko to Gonzalez's counterfeiting crime.

Although Hiruko and Cardona soon made statements which, viewed together with the seizure of the counterfeit from Gonzalez, would have supported a reasonable officer's belief that Hiruko had aided and abetted counterfeiting, the government's evidence establishes that those statements were not made until *after* Hiruko was under arrest. (*See* Tr. at 31 (Hiruko made his incriminating statements "as soon as he knew he was getting arrested").) Put another way, Hiruko's inculpatory statements survive Fifth Amendment scrutiny, because he blurted them out, but they were the direct result of his unlawful arrest, and thus must be excluded under the Fourth Amendment. *See Dunaway v. New York,* 442 U.S. 200, 217, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois,* 422 U.S. 590, 603–05, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

### D. *The Post–Miranda Statements*

Both Hiruko and Gonzalez seek to suppress the statements and confessions that they made at the police station, after their arrest and their waiver of their *Miranda* rights. The defendants were taken directly to the police station following their arrest outside of the Nissan, and *Miranda* warnings were administered to both shortly after they arrived at the precinct. (*See* Gov't Ltr. at 3; Tr. at 95; Gonzalez Br. at 5 ¶ 8.) Although testimony regarding the length of the delay between the arrests and the post-*Miranda* statements was not offered by the government, the defense has calculated it as about one hour or less.

Accordingly, I reject the government's claim that there was attenuation sufficient to "purge the primary taint of the unlawful invasion." *Wong Sun,* 371 U.S. at 486, 83 S.Ct. 407; *see also Crews,* 445 U.S. at 470, 100 S.Ct. 1244 (suppression applies to "words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal detention."). The post-arrest statements at the precinct were made directly after and as a result of the Fourth Amendment violations at the scene. The factors relevant to determining attenuation, such as the "temporal proximity of the arrest and confession, [and] the presence of intervening circumstances," *Brown,* 422 U.S. at 603, 95 S.Ct. 2254; *see also United States v. Ceballos,* 812 F.2d 42, 49–50 (1987), all weigh against the government's argument. The government has not even alleged an intervening event, and there was none. The break in time between the illegal arrests and the post-*Miranda* statements was quite short. *See, e.g., New York v. Harris,* 495 U.S. 14, 24, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) (one hour delay does not purge the taint); *Brown,* 422 U.S. at 604, 95 S.Ct. 2254 (two hour delay does not purge the taint). *Miranda* warnings alone

do not erase the taint, either. *Kaupp v. Texas* 538 U.S. 626, 633, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) (" '*Miranda* warnings, *alone* and *per se,* cannot always … break, for Fourth Amendment purposes, the causal connection between the illegality and the confession.' ") (quoting *Brown,* 422 U.S. at 603, 95 S.Ct. 2254).

## CONCLUSION

For the foregoing reasons, I conclude that the search of Gonzalez violated the Fourth Amendment. His motion to suppress the fruits of that search, and the statements he made after being unlawfully arrested, is granted. Hiruko's arrest violated the Fourth Amendment as well. His post-arrest statements are therefore suppressed. As for the physical evidence, Hiruko seeks to suppress only currency from the rear passenger floor. (*See* Weil's Dec. 15, 2003 Decl. at 4–5.) To the extent Hiruko's motion refers to the currency seized from Gonzalez's pocket, Hiruko lacks standing, and the motion is denied. A status conference will be held on June 18, 2004 at 11:30 a.m.

So Ordered.