[711 NYS2d 384]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FRANK ROBINSON, Appellant.

First Department, July 6, 2000

**APPEARANCES OF COUNSEL**

*Cheryl D. Harris* of counsel (*Stuart P. Levy* on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for respondent.

*Abigail Everett* of counsel (*Robert S. Dean, Center for Appellate Litigation,* attorney), for appellant, and appellant *pro se.*

**OPINION OF THE COURT**

Sullivan, P. J.

This appeal, from a conviction after trial, presents, *inter alia,* a challenge to the denial, after a hearing, of suppression of a gun recovered from the floor of a livery cab stopped by the police for a traffic violation. According to defendant, the cab was unconstitutionally stopped on the mere pretext of a traffic violation. In asserting this argument, defendant relies heavily on police testimony that the officers were staking out the area on the lookout for criminal activity against cab drivers by their passengers, and argues that the officers never intended to issue a summons for the traffic violation.

The following evidence was adduced at the hearing. On November 22, 1993, at approximately 8:20 P.M., Police Officers Currao, of the Street Crime Unit, Mobile Taxi Homicide Task Force, and Davis, of the Canine Unit, and the dog Rambo, were on motor patrol in a marked police car in the vicinity of Webster Avenue and 173rd Street in The Bronx. Davis, in uniform, was driving; Currao was in plain clothes.

As the officers were driving south on Webster Avenue, they observed a northbound car, traveling at a high rate of speed, pass a red light at the intersection of Webster Avenue and Claremont Parkway. Seeing that the vehicle was a "big four-door car," Currao, although not "a hundred percent sure," assumed it was a livery cab. While Currao could see the driver, he could not determine whether there were any other occupants. Davis turned the police vehicle around, and the officers activated the high intensity lights and pulled the cab over. Currao did not intend to issue a summons but, instead, planned to give the driver a leaflet on safety tips and "instruct him." As the cab pulled over, with the police vehicle directly behind, Currao observed defendant, seated in the cab's rear compartment, turning two or three times to view the officers.

Currao exited the police vehicle and approached the cab on the passenger side, while Davis approached on the driver's side. Each of the officers held a flashlight; neither had drawn his gun. As he watched Davis speak to the driver, Currao shined his flashlight into the back of the cab where defendant was seated, wearing a leather jacket that was about three-quarters closed, with the top part open so that Currao could see defendant's shirt. Noticing "a puffy area around [defen-

dant's] chest * * * [that] was bulging out," Currao believed that defendant was wearing a bulletproof vest. When, at Currao's request, defendant stepped out of the car, Currao placed his hand on defendant's chest where the jacket was open and confirmed his suspicion of a bulletproof vest.

Then Currao, without leaning into the car, shined his flashlight through the open door into the passenger compartment and saw a small revolver on the floor, "[r]ight in front of" where defendant had been seated. Currao handcuffed defendant and recovered the gun, which contained five rounds of ammunition. When Currao told Davis of his find, defendant stated, "It's not my gun."

A defense witness, claiming to have·seen the incident, testified that although she observed a police officer enter the rear compartment of the cab and later saw him reach his hand out of the rear passenger side window, she did not recall seeing a gun. Finding Currao's testimony to be credible and that the officers stopped the cab for a traffic infraction, which was not a subterfuge to conduct some other type investigation, and that the defense witness's testimony was irrelevant to the issue at hand, the hearing court denied the motion to suppress the gun, vest and defendant's statement. The trial evidence, although more comprehensive, basically followed the hearing narrative. On appeal, defendant challenges neither the weight nor sufficiency of the evidence but does renew his argument that the traffic stop was pretextual.

A pretext stop has generally been defined as a police officer's use of a traffic infraction as a subterfuge to stop a motor vehicle in order to investigate the driver or occupant about an unrelated matter. (*See, People v Laws*, 213 AD2d 226, 227, *lv denied* 85 NY2d 975.) The rule seems to be that the traffic violation may not be used as a pretext to investigate an unrelated matter. (*Supra; People v Letts*, 180 AD2d 931, 934, *appeal dismissed* 81 NY2d 833.) But as this Court noted in *People v Washington* (238 AD2d 43, 49, *lv denied* 91 NY2d 1014): "Although the Court of Appeals, in dicta, has expressed its concern about pretextual police conduct (*see, e.g., People v Spencer*, 84 NY2d 749, 753, *cert denied* 516 US 905; *People v Woods*, 64 NY2d 736, 737; *People v Prochilo*, 41 NY2d 759, 761-762), the court 'has never expressly held pretextual search and seizure conduct invalid under article 1, § 12' of the State Constitution (Pitler, *Independent State Search and Seizure Constitutionalism: The New York State Court of Appeals' Quest for Principled Decisionmaking*, 62 Brooklyn L Rev 1, 283-284, n 1096). On

the other hand, the United States Supreme Court, expressing the Federal view for determining the propriety of traffic stops, has held, contrary to the apparent New York rule, that the police officer's subjective reason for stopping an automobile is irrelevant as long as the stop is reasonable (*Whren v United States*, 517 US 806, 810-813) and that '[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred' (*supra*, 517 US, at 810)."

The Second Department, in *People v Henry* (258 AD2d 473, *lv denied* 93 NY2d 874), *People v Alcide* (252 AD2d 591) and *People v Dougherty* (251 AD2d 344, *lv denied* 92 NY2d 896), appears to have adopted the objective test set forth in *Whren*. The other Departments, including this Court, still recognize the concept of pretext stops and apply a subjective test to determine whether a stop is pretextual, that is, whether the traffic infraction was the primary motivation for stopping the vehicle or whether, instead, the officer's primary motivation was unrelated to the traffic violation. (*See, People v Washington, supra*, 238 AD2d at 47; *see also, People v Martinez*, 246 AD2d 456, 457, *lv denied* 92 NY2d 856 [this Court applied subjective test for determining legality of traffic stop, noting that *Whren* did not compel contrary result]; *People v Califano*, 255 AD2d 701; *People v McGriff*, 219 AD2d 829, 830.)

Unfortunately, the courts applying the subjective test "have never provided a uniform analytical framework for determining whether a stop is pretextual." (*People v Washington, supra*, 238 AD2d, at 50.) Nor has the Court of Appeals provided any guidelines in this area. (*Supra.*) As a result, courts relying on the subjective test have applied a variety of factors to determine the police officer's primary motivation: whether the officer checked the car's registration or issued a summons to its driver; whether the officer made any inquiry about the alleged traffic infraction other than asking for the driver's license and car registration; whether the officer's assignment included issuing traffic summonses; whether the officer followed the vehicle before observing the traffic infraction; whether, before the stop, the officer followed the car for a significant distance or, once stopped for a traffic infraction, detained defendant for an extended period of time, and whether the officer had, prior to the stop, already determined to stop and arrest the defendant. (*People v Washington, supra*, 238 AD2d, at 50.) If there is one less than salutary aspect of this analysis, it is "the evidentiary difficulty of establishing subjective intent" through objective means. (*Whren v United States, supra*, 517 US, at 814.)

Of course, we need not engage in an analysis applying the foregoing criteria to the underlying facts to determine the validity of the stop in question if we were to decide the case on the basis of *Whren v United States* (517 US 806, *supra*). *Whren* held that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." (*Supra,* at 810.) "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." (*Supra,* at 813.) Under such a standard, the validity of the stop in question is beyond reproach. Although defendant, in a *pro se* supplemental brief, suggests that no traffic violation ever occurred, at the hearing he never contested the police testimony and the court's finding that the cab driver passed a red light; he limited his argument to the claim that the stop for the traffic infraction was pretextual. Moreover, great deference is due the hearing court's factual findings based on a credibility determination. (*See, People v Martinez,* 267 AD2d 6.)

In *Whren* (517 US 806, *supra*), the defendant argued that the Fourth Amendment's test for determining the validity of traffic stops should not be the probable cause standard, but, rather, ought to turn or "whether a police officer, acting reasonably, would have made the stop for the reason given." (*Supra,* at 810.) The defendants argued that the standard proposed would be consistent with earlier Supreme Court decisions which "disapprov[ed] of police attempts to use valid bases of action against citizens as pretexts for pursuing other investigatory agendas." (*Supra,* at 811, citing *Florida v Wells,* 495 US 1, 4; *Colorado v Bertine,* 479 US 367, 372; *New York v Burger,* 482 US 691, 716-717.)

The Supreme Court rejected this argument, noting, "Not only have we never held, outside the context of inventory search or administrative inspection * * * that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary." (*Whren v United States, supra,* 517 US, at 812, citing *United States v Robinson,* 414 US 218; *Gustafson v Florida,* 414 US 260; *Scott v United States,* 436 US 128, 138.) Its prior cases, the Court noted, foreclosed "any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." (*Whren v United States, supra,* 517 US, at 813.) The principal basis of these earlier cases, the Court stated, which applies equally to efforts to determine subjective intent through ostensibly objec-

tive means, is "that the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent." (*Supra,* at 814.) Rejecting the subjective test, the Court concluded that there was "no realistic alternative to the traditional common-law rule that probable cause justifies a search and seizure." (*Supra,* at 819.)

The Supreme Court's unanimous holding in *Whren* was consistent with the "authorization test," already adopted by a majority of Federal circuit courts, which focused "not on whether a reasonable officer 'would' have stopped the suspect[,] * * * but on whether this particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop. The stop is reasonable if there was probable cause, and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop. It is also irrelevant whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop." (*United States v Scopo,* 19 F3d 777, 784 [2d Cir], *cert denied* 513 US 877, citing *United States v Ferguson,* 8 F3d 385, 391 [6th Cir], *cert denied* 513 US 828.)

As the *Scopo* court noted, this approach ensures that the "validity of traffic stops and arrests 'is not subject to the vagaries of police departments' policies and procedures,' while at the same time preventing insulation of persons involved in criminal activities from 'criminal liability for those activities simply because a judge determines that the police officer who executed the traffic stop * * * would not have stopped them for the traffic offense that they in fact committed.' [citation omitted]. This approach also allows law enforcement officials the freedom to enforce violations of the law—even minor ones—when they actually view violations, and, finally, it ensures 'that the courts leave to the legislatures the job of determining what traffic laws police officers are authorized to enforce and when they are authorized to enforce them' [citation omitted]." (19 F3d, at 784, quoting *United States v Ferguson, supra,* 8 F3d, at 392.)

Since, as noted, our Court of Appeals has never expressly held pretextual search and seizure conduct to be invalid under the State Constitution (*see, People v Washington, supra,* 238 AD2d, at 49), we are asked to adopt the *Whren* approach. While, to be sure, New York State courts are free to afford a broader scope of protection of individual rights under article I

(§ 12) of the State Constitution than that accorded under the Federal Constitution's Fourth Amendment (*see*, *People v Scott*, 79 NY2d 474, 490, 495-497), and, indeed, the Court of Appeals has done so on a number of occasions (*see*, *e.g.*, *People v Scott*, *supra*; *People v Harris*, 77 NY2d 434; *People v Dunn*, 77 NY2d 19, *cert denied* 501 US 1219), since the language of the two constitutional provisions "prohibiting unreasonable searches and seizures is identical, it may be assumed, as a general proposition, that [they] confer similar rights." (*People v Harris*, *supra*, at 437.) "Such consistency is desirable because it facilitates implementation of search and seizure rules." (*Supra*, at 437.) In interpreting our State Constitution, the Court of Appeals requires "[s]ufficient reasons" before it will construe the State provision differently from the construction placed on its Federal counterpart by the Supreme Court. (*Supra*, at 437.)

Two different analyses have traditionally been utilized to determine whether sufficient reasons exist to depart from the Supreme Court's interpretation of Federal constitutional provisions: "an interpretive analysis which examines the language of the provisions and a noninterpretive analysis which 'proceeds from a judicial perception of sound policy, justice and fundamental fairness.'" (*People v Harris*, *supra*, 77 NY2d, at 438, quoting, *People v P. J. Video*, 68 NY2d 296, 303, *cert denied* 479 US 1091.) Since the Federal Constitution's Fourth Amendment and article I (§ 12) of our State Constitution "contain similar language [and] share a common history" (*People v Harris*, *supra*, 77 NY2d, at 438), "[i]f a distinction is to be made in what they require * * * it must rest on a noninterpretive analysis of the State provision in which the Court focuses not on the text of the clause but on matters peculiar to this State." (*Supra*, at 438.) In its noninterpretive analysis, the Court of Appeals has considered such factors as "'any preexisting State statutory or common law defining the scope of the individual right in question; the history and traditions of the State in its protection of the individual right; any identification of the right in the State Constitution as being one of peculiar State or local concern; and any distinctive attitudes of the State citizenry toward the definition, scope or protection of the individual right.'" (*Supra*, at 438; *People v P. J. Video*, *supra*, 68 NY2d, at 303.)

Specifically declining to adopt any "rigid method of analysis" (*People v Scott*, *supra*, 79 NY2d, at 490), the Court of Appeals has held that a reasoned disagreement with a Supreme Court decision will provide a legitimate basis to interpret article I

(§ 12) more broadly than the Fourth Amendment in its protections. (*See, supra,* at 490-491.) This may be the case where the Supreme Court decision is perceived as not "adequately preserving fundamental rights of New York citizens." (*People v Scott, supra,* 79 NY2d, at 486; *see also,* Pitler, *Independent State Search and Seizure Constitutionalism: The New York State Court of Appeals' Quest for Principled Decisionmaking,* 62 Brooklyn L Rev 1, 218-322.)

In determining whether the validity of a vehicular stop should be resolved in accordance with the judicial interpretation given section 12 of article I's Federal counterpart, we note that New York has no unique history or tradition of assessing probable cause on the basis of a police officer's subjective intentions. As the Court of Appeals has repeatedly held, probable cause turns, not on subjective considerations, but on "what was reasonably and objectively in the mind of law enforcement authorities." (*People v Jennings,* 54 NY2d 518, 523.) This Court has held, "In determining whether probable cause exists, an 'objective judicial determination of the facts in existence and known to the officer' prevails over the officer's 'subjective evaluation.'" (*People v Jones,* 219 AD2d 417, 421, *affd* 90 NY2d 835, quoting *People v Lopez,* 95 AD2d 241, 246, *lv denied* 60 NY2d 968; *see also, People v King,* 102 AD2d 710, 711, *affd* 65 NY2d 702; *People v Kittrell,* 75 AD2d 548, 549, *lv denied sub nom. People v Miller,* 50 NY2d 1003.)

With these precedents as a guide and given this State's strong emphasis on reasonable objectivity, as opposed to the subjective intent of the police officers involved, we adopt and follow the Federal view that the subjective reason of the police for stopping an automobile is irrelevant in ascertaining probable cause as long as the stop is reasonable. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." (*Whren v United States, supra,* 517 US, at 810.) Such an approach ensures that the validity of traffic stops " 'is not subject to the vagaries of police departments' policies and procedures'" (*United States v Scopo, supra,* 19 F3d, at 784, quoting *United States v Ferguson, supra,* 8 F3d, at 392) and allows police officers the freedom to enforce violations of the law, even minor ones, when they witness them. (*Supra.*)

Of course, although it hardly need be stated, not all searches and seizures are reasonable even under the *Whren* standard merely on the basis of probable cause. Searches and seizures conducted in a blatantly improper manner will not be upheld.

(*Whren v United States, supra,* 517 US, at 818; *see, Tennessee v Garner,* 471 US 1 [by means of deadly force despite reasonable certainty that suspect was unarmed]; *Welsh v Wisconsin,* 466 US 740 [arrest for civil traffic offense by unannounced entry into a home absent exigent circumstances]; *Winston v Lee,* 470 US 753 [by physical penetration of a person's body].)

Finally, since we find the stop to have been lawful, Officer Currao had the right to remove defendant from the cab and, upon determining that defendant was wearing a bulletproof vest and recovering a gun on the floor where defendant—the cab's sole passenger—had been seated, could lawfully arrest him. (*See, e.g., People v Robinson,* 74 NY2d 773, *cert denied* 493 US 966.)

We have examined defendant's other contentions with respect to the conduct of the trial and his speedy trial issue and find that they are without merit.

Accordingly, the judgment of the Supreme Court, Bronx County (Lawrence Tonetti, J., at suppression hearing; Denis Boyle, J., at trial and sentence), rendered May 28, 1997, convicting defendant, after a jury trial, of criminal possession of a weapon in the third degree and unlawful wearing of a body vest, and sentencing him, as a persistent violent felony offender, to concurrent indeterminate terms of from 8 years to life and 1½ to 3 years, should be affirmed.

NARDELLI, MAZZARELLI and SAXE, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered May 28, 1997, affirmed.