OPINION OF THE COURT
Richard Lee Price, J.
The defendants were indicted for acting in concert to criminally possess a controlled substance in the first, third and fourth degrees (Penal Law §§ 220.21, 220.16, 220.34) on December 8, 2000.
By separate omnibus motions, each defendant was granted a Mapp hearing and defendant Figueroa was granted Wade, Dar *379 den, and Huntley hearings, as well.[1] Although initially scheduled for April 23, 2001, the Mapp hearing was delayed and did not begin until August 8, 2001. Extensive testimony was taken on that day, but because of the summer vacation schedule of the other officer, who was a potential witness, and a missing complaint report, the hearing did not resume until October 12, 2001.
On October 12, 2001 testimony concluded and oral argument was heard on October 26, 2001. At the conclusion of the hearing the matter was adjourned to November 20, 2001 for decision and, possibly, trial. Because of trial conflicts, the matter was further adjourned until December 14, 2001.
On November 30, 2001, the Assistant District Attorney submitted a brief in further support of her position, and she updated that memorandum with a finalized version on December 3, 2001. By phone call to chambers and in court on December 14, 2001, both defense attorneys asked for time to submit papers in response, and the case was farther adjourned for that purpose, to January 22, 2002. In the interim, the Court of Appeals handed down its decision in the trio of cases, People v Robinson, People v Reynolds, and People v Glenn (97 NY2d 341 [2001]). Because, as discussed below, that decision is dis-positive, suppression is denied in all respects.
Discussion
The facts, as testified to by the arresting officer, Police Officer Kristy Schmidt, are relatively uncomplicated. On December 8, 2000, two experienced police officers, wearing street clothes and traveling in an unmarked black sedan, were patrolling their precinct in the early morning hours. Around 3:30 a.m. they were driving on Ft. Independence heading towards Sedgwick Avenue when a black livery cab passed them “on the left side, going over the double yellow lines, sped off ahead of us and then made a left turn onto Reservoir Avenue without signaling.” {See Hearing Transcript [Tr] at 11.) The officers followed and put on their lights, stopping the cab at Reservoir and Claflin Avenues. Officer Schmidt got out and approached on the passengers’ side as her partner came up on the driver’s *380 side. Both officers had their police shields on chains around their necks.
While the other officer asked for the driver’s license and registration, Officer Schmidt came up to the passenger door with her flashlight and observed Mr. Figueroa “using his foot to hide something. He was, it was a plastic bag on the left side of his foot, as far away from me in the car, he was trying to, it appeared to me he was trying to close the top of it * * * With his foot he kicked it repeatedly. He repeatedly lifted his foot and put it down on top of the bag repeatedly.” (Tr at 13-14.)
Asking the passengers to get out of the car for her “safety,” the officer then used her flashlight to get a clear look at the contents of the bag. “I could see there was yellow, there were chunks of things wrapped up in what looked like yellow pages. It obviously wasn’t the yellow pages, something wrapped up in the yellow pages. I know that narcotics are often wrapped like that.” (Tr at 15.) Officer Schmidt testified that the objects in the bag “were like bricks. The size of each one was about the size of, I can only describe it as an ice cream sandwich, about that size. There were a whole bunch of them in this plastic bag * * * There were about eight of them taped together, eight of the ice cream sandwich size were taped together in bundles.” (Tr at 16.)
“Q. Did you have to go into the car to make this observation?
“A. No, I did not.
“Q. What else did you observe about the yellow bricks, as you described them?
“A. Once I realized, once I believed this was narcotics, I leaned a little closer to take a look. I could see that one was torn, and you could actually see the little tabs that was heroin, I believed to be heroin.
“Q. Again, did you have to go inside the car to make these observations?
“A. No, I did not.” (Tr at 16.)
The defendants were then arrested and searched. As it turned out, there were some 45 to 47 “tabs,” or glassine envelopes, of heroin in each of the 11 “bricks” or bundles. (Tr at 17, 21-22, 26.) In addition, “almost one thousand dollars and a cell phone” were recovered from Mr. Figueroa and another $500 and a beeper were taken from Mr. Caba. (Tr at 19, 21.)
Defense counsel both argued that the initial stop of the livery *381 cab was merely a “pretext”[2] and, beyond that, even had there been a basis for stopping the livery driver, the investigation and search of the defendants, who had no part in any of the alleged traffic infractions, was an impermissible violation of their right to privacy.
To some extent, the record, as developed through their cross-examination of the arresting officer, supports their assertions. Officer Schmidt conceded that the driver was never issued a traffic ticket for the erratic driving and speeding.[3] Indeed, although he was asked to do so, the driver never produced his license and registration, nor was the driver even told to get out of the car. (Tr at 46-47.) Officer Schmidt explained, “I don’t think he refused to present it, I believe it just never got to that point.” (Tr at 46.)
She also testified that after she saw the bags on the floor, she told the men to get out of the car and asked them if they had any weapons, but she did not have her own gun drawn at any time, and neither did her partner. Last, it was not until she placed the men under arrest that she actually went into the car to retrieve the bags. (Tr at 54-58, inter alia.)
None of this matters, however, in light of the majority decision in People v Robinson (supra), in which the Court of Appeals adopted, as consistent with New York State’s Constitution, the United States Supreme Court’s analysis in Whren v United States (517 US 806 [1996] [Scalia, J.]).
Defense counsel’s argument, that the stop was actually for the purpose of investigating the passengers and ensuring the driver’s safety, is an assertion that is somewhat borne out by Officer Schmidt’s immediate investigation of the passengers with her flashlight and the apparent unconcern of both officers for the driver. But a unanimous Supreme Court in Whren held that, regardless of whether a reasonable police officer would have done so, an officer’s subjective reason in temporarily detaining a motorist and his passengers is irrelevant so long as *382 he did actually possess probable cause to believe that the driver had committed a traffic violation. (Whren v United States, supra, 517 US at 810-813.)
People v Robinson (271 AD2d 17 [1st Dept 2000]) was also a Bronx case, very similar to the situation here, involving the stop of a livery cab early in the morning after patrolling officers observed it speed through a red light. Approaching the car, the arresting officer pointed his flashlight on the passenger and believed the man was wearing a bullet-proof vest. Making the man get out of the car, the officer then found a pistol on the rear floor. Despite the uncertainty as to the permissibility of pretextual stops under the New York State Constitution, the unanimous Appellate Division panel affirmed the conviction, employing the Whren analysis. Now, as noted," a sharply divided Court of Appeals has just affirmed that order and made Whren the law of this state. Accordingly, because the officers did have a reasonable basis for stopping the livery cab, the possibility that it was but a pretext is irrelevant and suppression is, therefore, denied.

. At the beginning of the hearing it became clear that there was no confidential informant and, therefore, no need for a Darden or Wade hearing. The hearing testimony did not cover the Huntley aspect, either.

. “A pretext stop has generally been defined as a police officer’s use of a traffic infraction as a subterfuge to stop a motor vehicle in order to investigate the driver or occupant about an unrelated matter. The rule seems to be that the traffic violation may not be used as a pretext to investigate an unrelated matter.” (People v Robinson, 271 AD2d 17, 19 [1st Dept 2000, Sullivan, P. J.] [citations omitted].)

. When asked why not, she opined that she “believed” the driver “acted that way deliberately.” (Tr at 19.) This answer was stricken. She also stated that because she “was involved in the arrest, [she] wasn’t concerned with the driver’s speeding at the time.” (Id.)