People v Hayes (2025 NY Slip Op 50883(U))

[*1]

People v Hayes

2025 NY Slip Op 50883(U)

Decided on May 12, 2025

Criminal Court Of The City Of New York, Bronx County

Lewis, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 12, 2025
Criminal Court of the City of New York, Bronx County

The People of the State of New York,

against
James Hayes, Jr., Defendant.

Docket No. CR-024432-24BX

People: Bronx District Attorney's Office by ADA Daniel Beloosesky and ADA Robert Ferrara
Defendant: The Legal Aid Society by Caroline Mary Rini, Esq. and Laura Weiner, Esq.

Daniel M. Lewis, J.

On October 04, 2024, Defendant was arraigned on charges of Vehicle and Traffic Law §§ 1192 (3) and 1192 (1) based on his alleged operation of a motor vehicle on September 23, 2024, at approximately 4:03 a.m. in Bronx County while he was in an intoxicated condition. At arraignment, the People served CPL 710.30 (1) (A) notice for a statement made to the arresting officer on scene at 4:03 a.m., and a NYS DMV Report of Refusal to Submit to Chemical Test. On December 27, 2024, the People served and filed an information, and on January 9, 2025, Defendant was arraigned on the information. Nothing indicates that subsequent CPL 710.30 (1) (A) notices were filed.
On April 30, 2025, J. Bondy denied Defendant's motion to invalidate the People's Certificate of Compliance, but granted Defendant's request for Dunaway, Huntley, Mapp, and Vehicle and Traffic Law § 1194 refusal hearings.
On May 06, 2025, the undersigned confirmed with defense counsel that no other hearings were requested and presided over the above hearings. The People called one witness: Police Officer (P.O.) Abdul Norman. Additionally, People's Exhibit #1a, P.O. Norman's body-worn camera (BWC) footage from the incident, and People's Exhibit #1b, P.O. Norman's BWC video footage from inside St. Barnabas Hospital, were received into evidence without objection.
Below constitutes the Court's decision on defense's preclusion motion, the findings of fact, and conclusions of law from that hearing.
I. PRECLUSION OF THE NOTICED STATEMENT
During summation, defense counsel orally moved to preclude the People's noticed statement, arguing that it was improperly noticed because the evidence showed that the statement was made at approximately 4:20 a.m. and in response to the responding Sergeant's question, not at 4:03 a.m. and not in response to P.O. Norman's question as indicated on the People's CPL 710.30 (1) (A) notice.
Persuasive appellate authority has held that the mere act of moving for suppression forecloses the challenge defense requests now (see People v Williams, 238 AD2d 914 [4th [*2]Dept1997] ["By moving for suppression, defendant waived his right to challenge the adequacy of the CPL 710.30 notice"]; People v Lazzaro, 62 AD3d 1035 [3d Dept 2009] ["Despite the inadequate notice, most of the statements were admissible against defendant because he moved to suppress his statements, those statements were identified at a hearing addressing their voluntariness and the court denied the motion after the hearing"]).
Furthermore, even if preclusion is not mandated, the "the purpose of CPL § 710.30 is to inform a defendant that the People intend to offer evidence of a statement to a public officer at trial so that a timely motion to suppress the evidence may be made" (People v Rodney, 85 NY2d 289, 291-92 [1995]). Additionally, "[s]o long as the intent to utilize the statement . . . at trial is clearly stated and the notice given is not misleading as to the number or specification of the statements . . . the notice is generally sufficient, even if not complete in every detail" (People v Centeno, 168 Misc 2d 172, 176-77 [Sup Ct, New York County 1995]).
To that end, courts routinely look to whether the People's noticed statement frustrated the controlling statute's purpose rather than whether the notice "lacked certain talismanic details." (Id. at 178; see e.g. People v Bowes, 206 AD3d 1260 [3d Dept 2022] [denying preclusion when the People's statement notice incorrectly identified the police officer to whom Defendant made the statement but otherwise comported with the statutory requirements]; People v Rivera, 306 AD2d 186 [1st Dept 2003] [denying preclusion when the time and location People's statement notice differed from the testimony during the suppression hearing]). Such is the situation here.
The People's CPL 710.30 (1) (A) notice was timely made within 15 days after arraignment, informing defense counsel of the People's intent to use the statement at trial; setting forth the correct date and location; and capturing the sum and substance of the statement. The 17-minute difference between the noticed and when People's Exhibit #1a showed the statement occurred and that there was a different listener "'did not change the substance of the notice or the ability of defense counsel to make a timely motion for a [suppression] hearing,'" particularly given that P.O. Norman was present for the statement itself (People v Bowes, 206 AD3d at 1265, quoting People v Daggett, 150 AD3d 1680, 1683 [4th Dept., 2017], lv denied 29 NY3d 1125 [2017]). Thus, defense's motion to preclude the noticed statement is denied.
II. FINDINGS OF FACT
P.O. Norman
P.O. Norman has been assigned to the 47th Precinct as a patrol officer for the past 3.5 years and has made approximately 43 arrests, two of which were for Driving while Intoxicated (DWI).
On September 23, 2024, at approximately 4:00 a.m., P.O. Norman was on duty, in uniform, inside a marked police vehicle with his partner, P.O. Devers, responding to a radio run for a vehicle collision at 4825 White Plains Road, Bronx County, New York. The location has two lanes of traffic in each direction, no exit or entrance ramps, and no traffic lights, and it is in a mixed commercial and residential area. On the date and time in question, the area was lit by streetlights; weather conditions were clear and dry; and there was some vehicular or foot traffic.
Upon arrival, P.O. Norman saw the aftermath of a collision between a Cadillac SUV and a sanitation truck, where the front, driver's side of the Cadillac SUV was smashed against the passenger side of the sanitation truck and there was significant damage to the Cadillac SUV and the sanitation truck. The driver of the sanitation truck was outside the vehicle and told P.O. [*3]Norman that while he was trying to back the truck into the laundry mat across the street to collect the business' garbage, the Cadillac SUV struck his passenger side. When P.O. Norman approached the Cadillac SUV, he saw that its airbags were deployed; that there were open and closed beer bottles on the passenger floorboard; and that there was a moderate odor of alcohol coming from the vehicle. P.O. Norman also observed that the driver of the Cadillac SUV was still seated in the driver's seat; that the engine was running with the key in the ignition; and that it appeared the driver could not get out. P.O. Norman then identified the driver of the Cadillac SUV as the Defendant in the instant case.
P.O. Norman then asked Defendant if he was in pain and who Defendant was on the phone with. To which, Defendant answered that his leg hurt and that he was talking to his wife. P.O. Norman stated that he observed Defendant's speech to be slurred. Then, P.O. Norman called for an ambulance and for FDNY. Upon arrival, FDNY removed Defendant from the Cadillac SUV, placed straps over his leg and stomach area on a stretcher, and transported Defendant to the ambulance where he was placed inside. During this time, P.O. Norman stated he conferred with the responding sergeant, SGT Abbas, and Officer Rakhmanimov.
After Defendant was inside the ambulance, P.O. Norman, SGT Abbas, and P.O. Rakhmanimov entered the ambulance, and P.O. Norman asked Defendant what happened. To which, Defendant made an incoherent response. P.O. Norman heard SGT Abbas ask Defendant whether he had been drinking, and P.O. Norman heard Defendant state that he had been. P.O. Norman stated that during this colloquy he detected a moderate odor of alcohol on Defendant's breath and that Defendant's speech was slurred. On cross-examination, P.O. Norman stated that at least three other police officers were standing outside the ambulance.
P.O. Norman stated that no officer made any threats or promises to Defendant, and all questions were asked and answered in English. P.O. Norman stated the above observations led him to conclude that Defendant had consumed alcohol before driving; that Defendant's having done so impaired his ability to drive; and that he believed Defendant was intoxicated at the time he was driving.
P.O. Norman accompanied Defendant in the ambulance to St. Barnabas Hospital, where they were met by PO. Lacheco of the highway unit. P.O. Norman stated that he observed Defendant for 20 minutes before he heard P.O. Lacheco offer Defendant the opportunity to take a blood test. However, on cross-examination, P.O. Norman stated the did not know whether he was present for the entirety of the 20-minute observation period. P.O. Norman then testified he heard Defendant refuse P.O. Lacheco's offer to take a blood test. In response, P.O. Norman heard P.O. Lacheco warn Defendant of the consequences of refusing to take a blood test, and P.O. Norman heard P.O. Lacheco offer Defendant the opportunity to take a blood test again. Which P.O. Norman heard Defendant refuse a second time. P.O. Norman also heard P.O. Lacheco offer Defendant the opportunity to take a PBT test, which Defendant also refused.
While viewing People's Exhibit #1a, P.O. Norman confirmed that he arrived on scene at 4:07 a.m., and he pointed out the beer bottles depicted in the video at 4:08:55. P.O. Norman then testified that the beer bottles in question at 4:10:09 appeared to be Red Stripe. P.O. Norman then stated that at 4:18:50, it appeared Defendant was holding a set of keys. P.O. Norman stated Defendant was placed under arrest at 4:22 a.m.
While viewing People's Exhibit #1b, P.O. Norman stated that he was standing to the right of P.O. Lacheco and that Defendant completed his refusal to take a blood test at 5:16 a.m. P.O. Norman also stated that upon observing Defendant's responses he noted that Defendant's speech [*4]was slurred and that he had a moderate odor of alcohol coming from his breath.
On cross-examination, P.O. Norman admitted that he did not know who caused the car accident and that he did not obtain any surveillance video of the area. Additionally, P.O. Norman admitted that prior to this incident, he had never heard Defendant speak before and could not say what his voice sounds like. P.O. Norman also stated that he later learned there was a cooler and ice were discovered inside the vehicle. P.O. Norman clarified that his statement "That's what this is looking like" at 4:17:34 in People Exhibit #1a referred to Defendant being intoxicated, which was before he entered the ambulance and asked Defendant questions.
People's Exhibit #1a
The court reviewed the entirety of People's Exhibit #1a and specifically notes the following:
• P.O. Norman and his partner approached the Cadillac SUV at approximately 4:08:26 a.m. on the front passenger side. The front passenger window is open, and the airbags are deployed. P.O. Norman's partner reaches his hand into the car, moves the airbag to the side, shines a flashlight inside the car and is heard asking "are you alright, man?"
• At 4:08:47, P.O. Norman's partner opens the front passenger door, looks inside, and is heard saying "Oh my god." He then says something inaudible to P.O. Norman, and they radio for an ambulance. Another officer approaches P.O. Norman, and P.O. Norman says, "it's not looking good."
• At 4:10:05, P.O. Norman asks Defendant who is on the phone with an whether he is in any pain. Defendant replies that he is on the phone with his wife and his left ankle is in pain. Clearly visible on the front passenger floorboard are several bottles of beer and a water bottle.
• At 4:18:49, P.O. Norman asks Defendant where he was coming from and what happened. Which Defendant does not respond to.
• At 4:19:26, P.O. Norman asks Defendant again what happened. To which, Defendant hands P.O. Norman his license. P.O. Norman then asks Defendant if the car is registered to him, and Defendant replies yes.
• At 4:19:57, P.O. Norman again asks Defendant what happened, and Defendant says, "bro, that truck . . . far as I remember, we was coming up or going back . . . far where I was going."
• At 4:20:37, SGT Abbas asks the Defendant if he had anything to drink today. To which, Defendant responded, "Yes, yes, I did have something to drink. Just left the bar. We was chilling. Coming home."
• At 4:29:40, P.O. Norman enters the ambulance where Defendant is also inside.
• At 4:30:54, BWC recording ends
People's Exhibit #1b
The court reviewed the entirety of People's Exhibit #1b and specifically notes the following:
• BWC footage begins at 5:14:37 a.m.
• At 5:16 a.m., P.O. Lacheco requests that Defendant take a blood test, and Defendant refuses. P.O. Lacheco then advises Defendant that refusal to take a blood test will result in immediate suspension; subsequent revocation of driving license or privilege for one [*5]year, regardless of whether he is found guilty of the charged offense; evidence of refusal may be used against him at a trial, proceeding, or hearing as a result of the arrest. Finally, P.O. Lacheco asks Defendant if he will take a blood test, and Defendant refuses.
• At 5:16 a.m., after Defendant's refusal, P.O. Lacheco asks Defendant if he will consent to take a breath test, and Defendant refuses.
• At 5:17 a.m., P.O. Norman advises Defendant of his Miranda rights, and Defendant requests a lawyer.
III. CONCLUSIONS OF LAW
The court finds that P.O. Norman was a credible witness and that he testified truthfully. Although P.O. Norman expressed uncertainty on cross-examination for some testimony proffered during direct, and at times he was unnecessarily pedantic in his answers on cross-examination, this did not rise to the level to impact his overall credibility or the truthfulness of his testimony.
Dunaway/Vandover
For a Dunaway hearing in a Vehicle and Traffic Law § 1192 context, "[t]he standard to be followed is that it is more probable than not that defendant is actually impaired" (People v Vandover, 20 NY3d 235, 239 [2012]). When coupled with a traffic accident outside police presence, Vehicle and Traffic Law § 1194 (1) (a) states, "a police officer may, without a warrant, arrest a person, in case of a violation of [Vehicle and Traffic Law § 1192 (1)], if such violation is coupled with an accident or collision in which such person is involved, which in fact has been committed, though not in the police officer's presence, when the officer has reasonable suspicion to believe that the violation was committed by such person." That is, police need not have witnessed the accident to make an arrest for Vehicle and Traffic Law § 1192 (1) so long as they conclude it is more probable than not that the person was impaired by the consumption of alcohol. Finally, "the legality of an arrest must be independently determined by the courts upon the actual facts and circumstances known to the officer . . . [the officer's] subject believe as to the existence of probable cause is not dispositive" (People v Lopez, 95 AD2d 241, 250 [2d Dept 1983]; see also People v Robinson, 271 AD2d 17, 24 [1st Dept 2000]).
For a Vehicle and Traffic Law § 1192 (1) offense, "driving a motor vehicle while there is any alcoholic impairment of the driver's 'ability to operate such vehicle' would constitute a violation" (People v Cruz, 48 NY2d 419, 426 [1979]). Indicia of impairment include a suspect's speech patterns "even if the suspect's speech is not obviously slurred" (People v Millet, 57 Misc 3d 1225[A]*3 [Crim Ct New York County 2017]). "Further, the fact of an accident may be construed to circumstantially suggest diminished motor control or impaired driving judgment by reason of alcohol consumption, without regard to proof of fault" (People v Maher, 52 Misc 3d 136[A]*2 [App Term, 2d Dept, 9th and 10th Jud Dists 2016]).
For a Vehicle and Traffic Law § 1192 (3) offense, "[t]he standard for determining intoxication is whether the consumption of alcohol has rendered [Defendant] incapable of performing the various mental or physical acts which an average person would be able to do" (Matter of Johnson, 75 NY2d 403, 409 [1990], referencing Cruz at 426). "Intoxication . . . 'is a greater degree of impairment which is reached when the driver has voluntarily consumed alcohol [*6]to the extent that he is incapable of employing the physical and mental abilities which he is expected to possess in order to operate a motor vehicle as a reasonable and prudent driver.'" (Id., citing People v Cruz, 48 NY2d at 428). Indicia of intoxication frequently include the subject's physical appearance, conduct and demeanor, responsiveness, speech patterns, coordination and balance, an odor of alcohol on the subject's breath, the presence of alcohol in the vehicle or on the subject's person, and any admission from the subject regarding consumption of alcohol. However, the ultimate question of whether the extant indicia rise to the level of probable cause is a "mixed question of law and fact." (People v Vandover, 20 NY3d 235 at 237).
Here, P.O. Norman arrived at the scene of an accident where the front driver's side of a Cadillac SUV had crashed into the passenger side of a sanitation truck, there was significant damage to the Cadillac, the front driver's side of the Cadillac was stuck against the sanitation truck, the Cadillac's airbags were deployed, and Defendant was trapped inside the driver's seat. Thus, it was more probable than not that Defendant operated the Cadillac SUV.
By the time of arrest (See, 'Huntley' section below) the evidence shows it was more probable than not "that Defendant was actually impaired" and intoxicated (Vandover at 237). P.O. Norman testified that at various points prior to arrest, he observed Defendant to have slurred speech and a moderate odor of alcohol on his breath. This testimony is corroborated by People's Exhibit #1a, which shows that P.O. Norman had sufficient opportunity to make his observations regarding Defendant's speech and to detect any odor of alcohol. People's Exhibit #1a also shows that when Defendant did respond to a question, the response was disjointed and somewhat incoherent. Additionally, P.O. Norman testified that he saw several open and closed bottles of beer on the front passenger-side floorboard, an observation similarly corroborated by People's Exhibit #1a. Coupled with the existence of the accident itself and Defendant's admission that he been drinking prior to driving, this court finds that P.O. Norman had probable cause to arrest Defendant for driving while intoxicated and for driving while his ability to operate a motor vehicle was impaired.
Thus, Defendant's motion to suppress the arrest as supported by probable cause is denied.
Huntley — on scene statement
The People have the burden of proving beyond a reasonable doubt, that the Defendant's statements were voluntary (see People v Anderson, 42 NY2d 35, 38 [1977]; People v Huntley, 15 NY2d 72 [1965]; People v Johnson, 139 AD3d 967 [2d Dept 2016]). When a person suspected of a crime is taken into custody or significantly deprived of freedom, Miranda warnings must be administered if he or she is to be interrogated (Miranda v Arizona, 384 U.S. 436 [1966]).
Insofar as the statement here was not the product of a promise, threat, or coercion, Defendant's statement was voluntary. P.O. Norman testified that no officer made any promises or threats to Defendant, and this is supported by People's Exhibit #1a, which lasts the duration of the police interaction from arrival on scene to Defendant's transport to St. Barnabas Hospital, well after Defendant's statement at issue here, and shows that no officer attempted to induce or threaten Defendant in word or deed.
However, the standard for determining whether an individual is in custody is an objective one. That is, whether a reasonable person, in the defendant=s position, innocent of any crime, would have thought that he or she was free to go (see People v Yukl, 25 NY2d 585 [1969]; [*7]People v Hall, 125 AD2d 698 [2d Dept 1986]). Subjective beliefs of either the defendant or police officer are not controlling (see People v Hicks, 68 NY2d 234 [1986]; People v Contini, 283 AD2d 323 [1st Dept 2001]).
In this case, the Court finds that point occurred after Defendant admitted drinking earlier in the evening and coming home from the bar. Prior to Defendant's statement, an innocent, reasonable person in Defendant's position would have thought he was headed to the hospital owing to his injuries from the collision, not having his freedom of movement restrained by police action. Notably, there was little, if any, police interaction with Defendant between the time when officers first saw Defendant trapped inside the Cadillac SUV and when police spoke to Defendant inside the ambulance. Instead, the police stood aside while FDNY extracted Defendant from the Cadillac SUV, placed him on the stretcher, and put him inside the ambulance. Additionally, it was FDNY/EMS who restrained Defendant on the stretcher, not police.
Nor would a reasonable, innocent person in Defendant's position have thought he was not free to go when police entered the ambulance and began questioning Defendant. This was police's first opportunity to ascertain what happened from the other party to the collision, and the questions asked were investigatory in nature. Finally, the existence of several police officers on scene would similarly not lead an innocent, reasonable person to conclude he was not free to go, as such a police response is expected for an accident of the magnitude as existed here.
As such, "[t]he events occurring between [when police arrived on scene to the accident] and the defendant's arrest cannot be characterized as the functional equivalent of a custodial interrogation requiring Miranda warnings" (People v Milo, 300 AD2d 680, 681 [2d Dept 2002]). Therefore, Defendant's motion to suppress the noticed statement is denied.
Mapp
At a Mapp hearing, the People have the initial burden of showing that there was probable cause to arrest the defendant. The burden then shifts to the defendant to prove by a preponderance of the evidence that police acted illegally (People v Berrios, 28 NY2d 361 [1971]). Here, Defendant argues that police conducted an unlawful search when upon arrival they opened the passenger door of his Cadillac SUV, and therefore the beer bottles police saw on the front passenger floorboard should be suppressed.
As ruled above, Defendant was not under arrest at the point where police opened the passenger door to his vehicle. Moreover, "an approach of an occupied, stationary vehicle to request information, including identification and information related to the lawful operation of the vehicle, is permitted where there is an "objective, credible reason" for doing so (People v Stevenson, 149 AD3d 1271, 1273 [3d Dept 2017], quoting People v Ocasio, 85 NY2d 982, 984 [1995]). Although "[t]here is no clear definition as to what constitutes a sufficient 'objective credible reason' to justify an initial approach to a legally parked automobile,'" such a basis surely exists where the vehicle is disabled in the middle of the street owing to a collision, as is the circumstance here (People v McCaul, 71 Misc 3d 126(A) [App. Term, 9th & 10th JD, 2021]).
For this situation, "[t]he proper test to be employed is the reasonableness of the government invasion of defendant's privacy . . . [which requires] a weighing of the government's interest against an individual's right to privacy and personal security." (People v Wheeler, 2 NY3d 370, 374 [2004]). This is a "'a dual inquiry: 'whether the officer's action was justified at its [*8]inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place'" (Id., quoting People v William II, 98 NY2d 93, 98 [2002]).
In People v McCaul, the Appellate Term affirmed the denial of a suppression motion that argued the police conducted an unlawful search when they opened the driver's door to ensure the well-being of an unresponsive driver and smelled alcohol on his breath, reasoning that at that time the police officer "was not engaged in his criminal law enforcement capacity when he opened the door of the vehicle to determine whether defendant was well and, if necessary, to provide assistance" (McCaul at 1).
In this case, P.O. Norman and his partner were the first officers on scene. People's Exhibit #1a clearly shows that the front, passenger-side airbag was blocking their view of Defendant who they heard in the driver's seat. To ascertain the extent of Defendant's injuries and the damage to the inside the vehicle, P.O. Norman's partner first leaned into the open passenger window, pushing past the airbag, and 19 seconds later he opens the passenger door. Similar to the officer in McCaul, P.O. Norman's partner's actions here were first and foremost to determine whether Defendant required assistance and therefore "justified at its inception" (Wheeler at 374).
Additionally, the action of P.O. Norman's partner was "reasonably related in scope to the circumstances which justified the interference." (Id.). Neither P.O. Norman nor his partner opened any additional doors, nor does People's Exhibit #1a show them looking into other areas of the vehicle. Instead, their intrusion into Defendant's privacy was limited to temporarily accessing an area where they could best see Defendant and determine the urgency and extent of the medical help needed and whether additional support would be necessary to remove Defendant from his vehicle. Thus, the officers' actions were reasonable and did not violate Defendant's right to privacy, and Defendant's motion to suppress the beer bottles is denied.
Vehicle and Traffic Law § 1194 / Refusal
Under Vehicle and Traffic Law § 1194 (2) (a), "[a]ny person who operates a motor vehicle in this state shall be deemed to have given consent to a chemical test . . . for the purpose of determining the alcoholic . . . content of the blood . . . at the direction of a police officer" if the test is offered within two hours after the driver was arrested for operating a motor vehicle in violation of Vehicle and Traffic Law § 1192. Additionally, under Vehicle and Traffic Law § 1194 (b), if a person validly arrested for Vehicle and Traffic Law § 1192 persistently refuses to submit to a chemical test despite clear, unequivocal warnings of the consequences of doing so, the refusal may be introduced into evidence (See People v Smith, 18 NY3d 544 [2012]; People v Pagan, 165 Misc 2d 255 [NY City Crim Ct 1995]). Conversely, a refusal obtained in violation of Vehicle and Traffic Law § 1194 is subject to suppression (See People v Boone, 71 AD2d 859 [2d Dept 1979]).
Here, Defendant was under arrest at 4:22 a.m. on suspicion of Vehicle and Traffic Law § 1192 (3) and Vehicle and Traffic Law § 1192 (1), and as ruled above, police had probable cause to arrest Defendant. At 5:16 a.m., P.O. Lacheco requests that Defendant take a blood test, and Defendant refuses. This is well within the 2-hour limit set forth in Vehicle and Traffic Law § 1194.
P.O. Lacheco then advises Defendant that refusal to take a blood test will result in immediate suspension; subsequent revocation of driving license or privilege for one year, regardless of whether he is found guilty of the charged offense; and evidence of refusal may be used against him at a trial, proceeding, or hearing as a result of the arrest. After administering [*9]these warnings, P.O. Lacheco asks Defendant if he will take a blood test, and Defendant refuses.
People's Exhibit #1b shows that P.O. Lacheco's warnings were unequivocal, clearly set forth the consequences of Defendant's continued refusal, and comport with the requirements of Vehicle and Traffic Law § 1194. Additionally, Defendant's refusal to take a blood test, both before and after being warned of the consequences, sufficiently demonstrates the persistence of his refusal. Therefore, Defendant's motion to suppress evidence of his refusal to take a blood test is denied.
The foregoing constitutes the decision and order of the Court.
Dated: May 12, 2025
Bronx, New York
DANIEL M. LEWIS, J.C.C.